**LaMONICA HERBST & MANISCALCO, LLP**
*Counsel to Plaintiff Salvatore LaMonica Solely as Trustee*
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: 516.826.6500
Joseph S. Maniscalco, Esq.
Jacqulyn S. Loftin, Esq.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:

PARTNERS IN TECH SERVICES, INC.,

Debtor.

Chapter 7
Case No.: 23-74484 (AST)
----------------------------------------------------------------x
Salvatore LaMonica, Solely In His Capacity As Chapter 7 Trustee of The Estate of Partners In Tech Services, Inc.,

Plaintiff,

-against-

Samson MCA LLC,

Defendant.
----------------------------------------------------------------x

Adv. Pro. No.: _________ (AST)

**COMPLAINT**

Plaintiff Salvatore LaMonica, solely in his capacity as Chapter 7 Trustee ("Plaintiff" or "Trustee") of the estate Partners In Tech Services, Inc. ("Debtor") by and through its undersigned counsel, for his Complaint against Samson MCA LLC ("Defendant") alleges as follows:

## NATURE OF ACTION

The nature of the action is to avoid and recover transfers made by the Debtor to Defendant prior to the bankruptcy filing, to reclassify the MCA Agreements (defined herein) and the related funding therein as unsecured loans, to void such unsecured loans, and for related relief.

**JURISDICTION AND VENUE**

1. The statutory predicates for the relief sought herein include 11 U.S.C. §§ 105(a), 544, 547, 548, and 550 ("Bankruptcy Code"), Rules 6009 and 7001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), sections 273 and 274 of the New York Debtor and Creditor Law, i.e., the New York Uniform Avoidable Transactions Act ("NY UVTA"), General Obligations Law ("GBL") § 5-501, and New York common law.

2. This action arises under the Debtor's Chapter 7 bankruptcy case pending in the United States Bankruptcy Court, Eastern District of New York ("Bankruptcy Court").

3. This Bankruptcy Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(a) and 1334(b).

4. This action is a core proceeding pursuant to 28 U.S.C. § 157(b)(1), (b)(2)(A), (b(2)(B), (b)(2)(E), (b)(2)(H), (b)(2)(K) and (b)(2)(O).

5. Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1409(a).

6. Plaintiff consents to the entry of final orders and judgments by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**THE PARTIES**

7. Plaintiff Salvatore LaMonica was appointed as the interim Chapter 7 Trustee of the Debtor's estate, has since duly qualified, and is the permanent Trustee of the Debtor's estate.

8. Defendant Samson MCA LLC is a domestic limited liability company duly organized and existing under and by virtue of the laws of the State of New York.

9. Defendant Samson MCA LLC has an address at 17 State Street, Suite 630, New York, New York 10038.

## BACKGROUND

### A. Relevant Procedural Background

10. On November 29, 2023 ("Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Bankruptcy Code in the Bankruptcy Court.

11. By Notice of Appointment dated December 5, 2023, Salvatore LaMonica was appointed as the Subchapter V Trustee of the Debtor's estate.

12. By Order of the Court dated June 7, 2024, the Debtor's Chapter 11 was converted to one under Chapter 7 of the Bankruptcy code.

13. Upon the conversion, Plaintiff became the interim Chapter 7 Trustee of the Debtor, has since duly qualified, and is the permanent Chapter 7 Trustee administering the Debtor's estate.

14. The last day to file proofs of claim against the Debtor's estate was October 29, 2024.

### B. Transactional History between the Debtor and Defendant

15. On April 12, 2019, Goodman Factors and the Debtor entered into a Factoring Agreement and Security Agreement whereby the Debtor agreed to sell to Goodman Factors the Debtor's accounts receivable, chattel paper, documents, instruments, and general intangibles arising out of the sale of goods, services rendered, or labor performed by the Company for the Debtor during the term of this agreement.

16. On April 18, 2019, Goodman Factors filed a statement under the Uniformed Commercial Code ("UCC") and took a continued security interest in "all of the Debtor's accounts, notes, and other choses in action, chattel paper, instruments, documents, commercial tort claims, letter of credit rights, software intellectual property, and general intangibles presently existing and

hereafter arising, and all inventory now existing and hereafter acquired wherever located, and all other proceeds thereof of every kind and nature."

17.    Through its UCC filing, Goodman Factors provided notice to third parties of its perfected security interest in the Debtor's assets.

18.    On May 18, 2020, the Debtor obtained a loan from the Small Business Association ("SBA") in the amount of $1,969,200 (MM), and the SBA took a security interest in the "Debtor's Collateral", as defined in the loan documents ("SBA Loan").

19.    In the SBA Loan, the "Debtor's Collateral is defined as "all tangible and intangible personal property including but not limited to (a) inventory, (b) equipment, (c) instruments, including promissory notes, (d) chattel paper, including tangible chattel paper and electronic chattel papers, (e) documents, (f) letter of credit, (g) accounts, including health care insurance receivable and credit card receivable, (h) deposit accounts, (i) Commercial tort claim . . .".

20.    On May 27, 2020, the SBA filed a UCC statement and obtained a security interest in the Debtor's Collateral, which has the same definition as set forth in the SBA Loan, which provided third parties with notice of such perfected security interest.

**i.    MCA Agreement 1**

21.    On November 18, 2020, the Debtor and Defendant entered into an agreement titled Revenue Based Factoring Agreement whereby, among other things, Defendant purported to purchase 25% of the Debtor's future receivables for $102,000.

22.    MCA Agreement 1 provides that Defendant would automatically withdraw $850 each business day up until full purchased amount was paid ("MCA Agreement 1").

23. On November 19, 2020, in furtherance of MCA Agreement 1, Defendant remitted into the Debtor's bank account ending in 3485 held at Bank of America, N.A. ("Debtor's Bank Account") the amount of $72,625 ("Defendant Funding 1").

24. From November 20, 2020, through May 13, 2021 (a period of 180 business days), five (5) days a week, in connection with MCA Agreement 1, Defendant withdrew $850, each day from the Debtor's Bank Account for an aggregate withdrawal amount of $101,500 (collectively, "Daily Transfers 1").

25. The difference between the Purchase Price ($102,000) and the Defendant Funding 1 ($72,625) is $28,875.

26. The term of MCA Agreement 1 was 180 days.

27. Over a period of 180 days, Defendant was positioned to receive $28,875 above Defendant Funding 1.

| Purchase Price Under MCA Agreement 1 | Amount Received by Debtor Under MCA Agreement 1 | Daily Sweep Amount by Defendant under MCA Agreement 1 | Total Amount withdrawn from Debtor's Account |
|---|---|---|---|
| **$102,000** | **$72,625** | **$850** | **$101,500** |

**ii. MCA Agreement 2**

28. On October 20, 2021, the Debtor and Defendant entered into a second Revenue Purchase Agreement whereby, among other things, Defendant purported to purchase 25% of the Debtor's future receivables for $227,500.

29. MCA Agreement 2 provides that Defendant would automatically withdraw $1,599 each business day up until full purchased amount was paid ("MCA Agreement 2").

30. On October 22, 2021, in furtherance of the execution of MCA Agreement 2, Defendant remitted to into the Debtor's Bank Account the amount of $174,975 ("Defendant Funding 2").

31. From October 25, 2021, through May 13, 2022 (a period of 137 business days), five (5) days a week, in connection with MCA Agreement 2, Defendant withdrew $1,599 each day from the Debtor's Bank Account for an aggregate amount of $225,459 (collectively, "Daily Transfers 2").

32. The difference between the Purchase Price ($227,500) and the Defendant Funding 2 ($174,975) is $52,525.

33. Over the period of the MCA Agreement 2, Defendant was positioned to receive $52,525 above Defendant Funding 2.

**iii. MCA Agreement 3**

34. On November 3, 2021, the Debtor and Defendant entered into a third agreement titled Revenue Purchase Agreement, whereby, among other things, Defendant purchased 25% of the Debtor's future receivables for $134,000 ("MCA Agreement 3").

35. MCA Agreement 3 provides that Defendant would automatically withdraw $943.66 each business day up to the full purchased amount.

36. On November 19, 2020, in furtherance of MCA Agreement 3, Defendant remitted to the Debtor $99,950 ("Defendant Funding 3") into the Debtor's Bank Account.

37. From November 8, 2021, through May 20, 2022 (a period of 132 days), five (5) days a week, in connection with MCA Agreement 3, Defendant withdrew $943.66 each day for an aggregate amount of $113,235.90 ("Daily Transfers 3") from the Debtor's Bank Account.

38. On August 3, 2022, the Debtor received a loan in the amount of $750,136.89 from Richard Duckstad ("R. Duckstad Loan"), which was deposited into the Debtor's bank account ending in 3722 at Chase Bank ("Debtor Chase Account").

39. On August 3, 2022, the Debtor paid $175,000 from the proceeds of the R. Duckstad Loan to Defendant on account of the outstanding balances owed to Defendant under MCA Agreements 2 and 3.

40. The difference between the purchase price of MCA Agreements 2 and 3 ($361,500 in the aggregate) and the Defendant Fundings 2 and 3 ($274,925) is $86,575.

41. Over a period of 145 days, Defendant was positioned to receive $86,575 above Defendant Fundings 2 and 3.

42. In addition, Defendant received a lump sum payment of $175,000 from the R. Duckstad Loan.

43. In total, on account of MCA Agreements 2 and 3, Defendant received $513,694.90.

| Purchase Price Under MCA Agreements 2 & 3 | Amount Received by the Debtor Under MCA Agreement 2 & 3 | Daily Sweep Amount by Defendant under MCA Agreements 2 & 3 | Total Amount Defendant Received from Debtor |
|---|---|---|---|
| **$361,500** | **$274,925** | **$338,694.90** | **$513,694.90** |

**iv. <u>MCA Agreement 4</u>**

44. On February 22, 2023, the Debtor and Defendant entered into a fourth agreement titled Revenue Purchase Agreement, whereby, among other things, Defendant purchased 10% of the Debtor's future receivables for $408,000 ("<u>MCA Agreement 4</u>").

45. MCA Agreement 4 provides that Defendant would automatically withdraw $2,499 each business day up to the full purchased amount.

46. On February 24, 2023, in furtherance of MCA Agreement 4, Defendant remitted to the Debtor $296,900 ("Defendant Funding 4") into the Debtor Chase Account.

47. From February 27, 2023, through May 3, 2023 (a period of 47 days), five (5) days a week, in connection with MCA Agreement 4, Defendant withdrew $2,499 each day for an aggregate amount of $117,453 ("Daily Transfers 4") from the Debtor's Bank Account.

48. The difference between the purchase price of MCA Agreement 4 ($408,000) and the Defendant Funding 4 ($296,900) is $111,100.

49. Over a period of 47 days, Defendant was positioned to receive $111,100 above Defendant Funding 4.

50. The term of MCA Agreement 4 was 47 days.

51. Over a period of 47 days, Defendant was positioned to receive $111,100 above Defendant Funding 4.

| Purchase Price Under MCA Agreement 4 | Amount Received by Debtor Under MCA Agreement 4 | Daily Sweep Amount by Defendant under MCA Agreement 4 | Total Amount withdrawn from Debtor's Account |
|---|---|---|---|
| **$408,000** | **$296,900** | **$2,499** | **$117,453** |

**v. The Refinance of MCA Agreement 4 into MCA Agreement 5**

52. On May 3, 2023, the Debtor and Defendant entered into a fifth agreement titled Revenue Purchase Agreement, which was a refinance of MCA Agreement 4 whereby, among other things, the balance owed at the time from MCA 4 Agreement in the amount of $272,500 was refinanced and Defendant purchased 14% of the Debtor's future receivables for $601,750 ("MCA Agreement 5").

53. On May 5, 2023, in furtherance of the refinance of MCA Agreement 4 and the execution of MCA Agreement 5, Defendant remitted into the Debtor Chase Account the amount of $129,950 ("Defendant Funding 5").

54. From May 8, 2023, through July 13, 2023 (a period of 47 business days), five (5) days a week, in connection with MCA Agreement 5, Defendant withdrew $6,017.50 each day from the Debtor Chase Account for an aggregate amount of $282,822.50 (collectively, "Daily Transfers 5").

55. According to payment schedule provided by Defendant, the Debtor received a credit for the balance owed under MCA Agreement 4 in the amount of $272,500.

56. The difference between the Purchase Amount ($601,750) and the Defendant Funding 5 ($129,950) plus the credit ($272,500) from MCA Agreement 5 is $199,300.

57. Over the course of the MCA Agreement 5, Defendant was positioned to receive $199,300 above Defendant Funding 5.

| **Purchase Price Under MCA Agreement 5** | **Amount Received by the Debtor Under MCA Agreement 5** | **Daily Sweep Amount by Defendant under MCA Agreement 5** | **Total Amount withdrawn from Debtor's Account** |
|---|---|---|---|
| **$601,750** | **$129,950** | **$6,017.50** | **$282,822.50** |

**vi. The Refinance of MCA Agreement 5 into MCA Agreement 6**

58. On July 12, 2023, the Debtor and Defendant entered into a sixth agreement titled Sale of Future Receipts Agreement, which was a refinance of MCA Agreement 5 whereby, among other things, the balance owed at the time from MCA 5 Agreement in the amount of $280,000 was refinanced and Defendant purchased 12% of the Debtor's future receivables for $601,750 ("MCA Agreement 6", along with MCA Agreements 1, 2, 3, 4 and 5 are "MCA Agreements").

59. On July 14, 2023, in furtherance of the refinance of MCA Agreement 5 and the execution of MCA Agreement 6, Defendant remitted into the Debtor Chase Account the amount of $118,275 ("Defendant Funding 6", along with Defendant Funding 1, 2, 3, 4 and 5 are "Defendant Funding").

60. From July 14, 2023, through October 18, 2023 (a period of 66 business days), five (5) days a week, in connection with MCA Agreement 6, Defendant withdrew between $6,017.50 and $500 each day from the Debtor Chase Account for an aggregate amount of $148,989.50 (collectively, "Daily Transfers 6", along with Daily Transfers 1, 2, 3, 4 and 5 are "Daily Transfers").

61. According to payment schedule provided by Defendant, the Debtor received a credit for the balance owed under MCA Agreement 5 in the amount of $280,000.

62. The difference between the Purchase Amount ($601,750) and the Defendant Funding 6 ($118,275) plus the credit ($280,000) from MCA Agreement 6 is $203,475.

63. Over the course of the MCA Agreement 6, Defendant was positioned to receive $203,475 above Defendant Funding 6.

| Purchase Price Under MCA Agreement 6 | Amount Received by the Debtor Under MCA Agreement 6 | Daily Sweep Amount by Defendant under MCA Agreement 6 | Total Amount withdrawn from Debtor's Account |
|---|---|---|---|
| **$601,750** | **$118,275** | **$6,017.50-$500** | **$148,989.50** |

**vii. Total Amounts Remitted Under All MCA Agreements**

64. Defendant received a total of $1,164,459.90 in Daily Transfers from the Debtor on account of Defendant Funding in the amount of $774,400.

65.     According to the Debtor's books and records and the remittances made, the Debtor received $774,400 from Defendant and paid $390,059.90 above Defendant Funding during the three years in which Defendant provided funding to the Debtor.

66.     Taking into consideration what the Debtor actually received, and the amount paid to Defendant, the interest computation is 172% per annum.

67.     According to the MCA Agreements, each of the agreements were considered non-recourse.

68.     During the 90 days prior to the Filing Date, Defendant received $20.117 in transfers paid by the Debtor ("90 Day Transfers").

69.     The Trustee reserves the right to avoid and recover any other identifiable transfers made by Debtor to Defendant under any other newly discovered "MCA Agreement(s)" by and between the Debtor and Defendant.

**C.      The Defendant Funding Is a Loan**

70.     According to the Debtor, Defendant Funding and the loan documents purported to describe funding as "advances" or so-called "merchant cash advances" for the supposed "sale and repurchase of future accounts receivable"; but the Debtor did not own any of its accounts receivable having previously: (i) in 2019 sold its receivable invoices to Goodman Factors; and (ii) in 2020 having previously pledged all of its assets as Debtor's Collateral to the SBA for its prior SBA Loan.

71.     According to the Debtor, Defendant did not conduct reasonable due diligence other than seeking three months' bank statements of the Debtor's Bank Account.

72.     According to the Debtor, Defendant did not seek the Debtor's tax returns to determine its profitability.

73.     According to the Debtor, Defendant did not request a trial balance from the Debtor.

74.     According to the Debtor, Defendant did not request a receivable aging report from the Debtor.

75.     According to the Debtor, Defendant did not request a payable aging report from the Debtor.

76.     According to the Debtor, Defendant did not seek from the Debtor an analysis of assets and liabilities.

77.     Upon information and belief, Defendant conducted a UCC search of the Debtor's business.

78.     Upon information and belief, Defendant conducted a judgment lien search of the Debtor's business.

79.     Upon information and belief, Defendant had knowledge of Goodman Factors.

80.     Upon information and belief, Defendant had knowledge of the SBA Loan.

81.     While the parties entered into the MCA Agreements, there was nothing to purchase.

82.     At the time of the MCA Agreements, Defendant knew the Debtor's receivables were already collateralized to Goodman Factors and the SBA.

83.     At the time of the MCA Agreements, Defendant should have known the Debtor's receivables were already collateralized to Goodman Factors and the SBA.

84.     The Defendant Funding could never have legally supported the claimed "sale and repurchase of accounts receivable," and there was nothing to sell and Defendant knew this.

85.     Upon information and belief, the Debtor is not sophisticated in business transactions such as the MCA Agreements and did not understand the nuances of the sale of its accounts receivable.

86.    Upon information and belief, Defendant is a sophisticated business with extensive knowledge of receivables, collateral, factoring, financing and whether the Debtor could afford the payments under the MCA Agreements.

87.    Upon information and belief, Defendant has been involved in the purchase of accounts receivable business for many years.

88.    Upon information and belief, Defendant directed the Debtor on matters of financing, how the process works, and the payments to be made.

89.    Balancing the relationship between the Debtor and Defendant, Defendant had the leverage, knowledge, expertise and business acumen for the MCA Agreements.

90.    The Defendant Funding was an unsecured loan.

91.    According to the Debtor, Defendant's actions all demonstrate that despite the reference to a "sale," no subject account receivable was ever identified in the Financing Agreement or otherwise; no title to any such accounts receivable was transferred to the "buyer," and the purported "seller" [the Debtor] rather the purported "buyer," [Defendant] remained liable for non-repayment of the loaned funds, and thus, no sale of any kind took place.

92.    The MCA Agreements and the Defendant Funding were always intended to be loans from inception, referred to as such by many of the parties hereto, but merely superficially disguised to avoid obvious violations of New York's usury laws.

93.    According to the Debtor, the collection of ACH debits by Defendant taken directly from the Debtor's bank assets: (i) violated the prior secured lien of record filed by the SBA on all the Debtor's assets as collateral pledged as security for a prior SBA Loan of nearly $2,000,000 (MM); and (ii) such wrongful and illegal collection damaged or otherwise destroyed the Debtor's ability to repay its Defendant Funding causing it to borrow additional loans which the lenders

required the Debtor to use to prepay prior loans, at confiscatory interest rates resulting in the Debtor's constant indebtedness for twenty-nine (29) merchant cash advance loans which eventually put the Debtor out of business causing it damages in excess of $25,000,000 (MM).

**D.    The Defendant's Loan Is Considered Usury**

94.    Under NY GBL section 5-501(6)(b), usury laws apply to commercial loans under $2,500,000 (MM).

95.    The Defendant Funding was less than $2,500,000 (MM), and therefore the usury law applies under GBL section 5-501(6)(b).

96.    Under, NY CLS Penal section 190.40, criminal usury, "a person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period".

97.    Based on the analysis of the MCA Agreements and the related Defendant Funding, Defendant received interest of 172% on account of its Defendant Funding.

98.    As a result of the usury interest rate of 172% received by Defendant Funding, the MCA Agreements are void.

99.    As a result of the usury interest rate of 172% received by Defendant Funding, the Daily Transfers are void.

100.    As a result of the usury interest rate of 172% received by Defendant Funding, the interest paid by the Debtor on account of the MCA Agreements are void.

**FIRST CLAIM FOR RELIEF**
**(The MCA Agreements Are Disguised Loans)**

101. Plaintiff repeats and realleges each of the above allegations as if set forth fully herein.

102. The MCA Agreements impose finite terms.

103. The MCA Agreements provide for recourse in the event of the Debtor's business failure.

104. Upon information and belief, the MCA Agreements do not contain express reconciliation or adjustment provisions.

105. According to the Debtor, it sought a reconciliation of the MCA Agreements.

106. According to the Debtor, despite the request for reconciliation, Defendant did nothing and never adjusted the Daily Transfers.

107. Defendant did not assume the risk that the Debtor would have less than expected or no revenues, so the economic substance of the transaction was a loan, not a purchase of receivables.

108. By purchasing more than 100% (at 111%) of the Debtor's accounts receivable over a period of five months, Defendant knows the Debtor would default.

109. By purchasing more than 100% (at 111%) of the Debtor's account receivables over a period of five months, the default left the Debtor with no working capital to pay employees or other creditors.

110. The MCA Agreements are disguised loan transactions.

111. Upon information and belief, the Debtor did not understand the difference between a purchase of receivables and a loan transaction.

112. By reason of the foregoing, Plaintiff is entitled to a declaratory judgment reclassifying the MCA Agreements as loan transactions.

**SECOND CLAIM FOR RELIEF**
**(The Defendant Funding Was Usury and Should be Void under GBL § 5-501)**

113. Plaintiff repeats and realleges each of the above allegations as if set forth fully herein.

114. Based on the analysis of the Daily Transfers, Defendant received interest of 172% on account of its Defendant Funding.

115. As a result of the usury interest rate of 172% received against Defendant Funding, the MCA Agreements are void.

116. As a result of the usury interest rate of 172% received by Defendant Funding, the Daily Transfers are void.

117. As a result of the usury interest rate of 172% received by Defendant Funding, the interest paid by the Debtor on account of the MCA Agreements is void.

118. By reason of the foregoing, Plaintiff is entitled to an order and judgment against Defendant declaring that the MCA Agreements are void and thereby avoiding the Daily Transfers and interest in the amount of $1,164,459.90, together with applicable prejudgment interest, costs, and reasonable attorney's fees.

**THIRD CLAIM FOR RELIEF**
**(Attacking Nature, Extent and Validity of the Purported Loan)**

119. Plaintiff repeats and realleges each of the above allegations as if set forth fully herein.

120. Defendant has no claim, right, title, lien or interest against the Daily Transfers.

121. Based upon the foregoing, Plaintiff seeks a judgment against Defendant, declaring, pursuant to 28 U.S.C. § 2201, and determining, that Defendant has no claim, right, title, lien or interest against the Daily Transfers.

122. Plaintiff is entitled to a judgment against Defendant declaring that Defendant be forever barred from asserting any and all claims, liens, or interest in and to the Daily Transfers.

**FOURTH CLAIM FOR RELIEF**
**(Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B))**

123. Plaintiff repeats and realleges each of the above allegations as if set forth fully herein.

124. At the time of the Daily Transfers and/or as a result of such Daily Transfers, the Debtor was insolvent or rendered insolvent as a result thereof.

125. At the time of the Daily Transfers, the Debtor was engaged in a business or transaction or was about to engage in a business or transaction for which the property remaining with the Debtor was an unreasonably small capital.

126. At the time of the Transfers and/or as a result of the Daily Transfers, the Debtor intended to incur or believed that it would incur debts beyond the Debtor's ability to pay as such debts matured.

127. The Daily Transfers constitute fraudulent transfers pursuant to Bankruptcy Code section 548(a)(1)(B).

128. By reason of the foregoing, Plaintiff is entitled to an order and judgment against Defendant: (a) avoiding and setting aside the Daily Transfers; and (b) pursuant to Bankruptcy Code section 550(a), recovering from Defendant $1,164,459.90, together with applicable prejudgment interest, costs, and reasonable attorney's fees.

**FIFTH CLAIM FOR RELIEF**
**(Fraudulent Transfer Pursuant to NY UVTA § 273(b))**

129. Plaintiff repeats and realleges each of the above allegations as if set forth fully herein.

130. At the time of the Daily Transfers, the Debtor was engaged or about to engage in a business or transaction for which the property remaining in its possession after these Daily Transfers constituted an unreasonably small capital.

131. The Daily Transfers constitute fraudulent conveyances pursuant to NY UVTA section 273(b).

132. By reason of the foregoing, pursuant to Bankruptcy Code section 544(b), Plaintiff is entitled to an order and judgment against Defendant: (a) avoiding the Daily Transfers pursuant to NY UVTA section 273(b); and (b) pursuant to Bankruptcy Code section 550, recovering from Defendant $1,164,459.90, together with applicable prejudgment interest, costs, and reasonable attorney's fees.

**SIXTH CLAIM FOR RELIEF**
**(Fraudulent Transfer Pursuant to NY UVTA § 274)**

133. Plaintiff repeats and realleges each of the above allegations as if set forth fully herein.

134. The Debtor made the Daily Transfers without receiving a reasonably equivalent value in exchange for the Daily Transfers.

135. Defendant had reasonable cause to believe that the Debtor was insolvent at the time of the Daily Transfers.

136. The Daily Transfers constitute fraudulent conveyances pursuant to NY DCL section 274.

137. By reason of the foregoing, pursuant to Bankruptcy Code section 544(b), Plaintiff is entitled to an order and judgment against Defendant: (a) avoiding the Daily Transfers pursuant to NY UVTA section 274; and (b) pursuant to Bankruptcy Code section 550, recovering from Defendant $1,164,459.90, together with applicable prejudgment interest, costs, and reasonable attorney's fees.

**SEVENTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**

138. Plaintiff repeats and realleges each of the above allegations as if set forth fully herein.

139. Defendant unfairly benefited from the Daily Transfers.

140. As a matter of equity and good conscience, Defendant should not be allowed to retain the Daily Transfers.

141. Defendant has been unjustly enriched by the Daily Transfers to the detriment of the Debtor's bankruptcy estate.

142. By reason of the foregoing, Plaintiff is entitled to an order and judgment against Defendant in the amount of $1,164,459.90, together with applicable prejudgment interest, costs, and reasonable attorney's fees.

**EIGHTH CLAIM FOR RELIEF**
**(Preferential Transfers Pursuant to 11 U.S.C. § 547)**

143. Plaintiff repeats and realleges each of the above allegations as if set forth fully herein.

144. The 90 Day Transfers were made within ninety (90) days of the Filing Date.

145. The 90 Day Transfers were made to, or for the benefit of, Defendant.

146. The 90 Day Transfers were made to, or for the benefit of, Defendant, to reduce or satisfy a debt owed by the Debtor to Defendant.

147. The 90 Day Transfers were made on account of an antecedent debt owed by the Debtor to Defendant.

148. The Debtor is presumed to have been insolvent when each of the 90 Day Transfers were made.

149. The 90 Day Transfers were made to Defendant while the Debtor was insolvent.

150. As a result of the 90 Day Transfers, Defendant received more than it would have otherwise received: (a) in this Chapter 7 bankruptcy case; (b) if the 90 Day Transfers had not been made; and (c) if Defendant received payment to the extent provided by the provisions of the Bankruptcy Code.

151. The 90 Day Transfers to Defendant constitute preferential transfers under Bankruptcy Code section 547(b).

152. Based on the information available to him, Plaintiff has considered the present known or reasonably knowable affirmative defenses that might be available to Defendant and believes that net of prospectively bona fide statutory defenses, Defendant has liability for the 90 Day Transfers under Bankruptcy Code section 547(b) in a sum no less than $20,117 together with applicable interest, costs, and reasonable attorney's fees.

153. By reason of the foregoing, and in accordance with Bankruptcy Code sections 547 and 550, Plaintiff is entitled to an Order and judgment: (i) avoiding the 90 Day Transfers made by the Debtor to the Defendant; and (ii) a money judgment in an amount to be determined at trial, but in no event believed to be less than $20,117, together with applicable prejudgment interest, costs, and reasonable attorney's fees.

**NINTH CLAIM FOR RELEIF**
**(Disallowance of Claims under 11 U.S.C. §§ 502(d) and (j))**

154. Plaintiff repeats and realleges each of the above allegations as if set forth fully

herein.

155.    Defendant has not paid the amount of the avoidable Daily Transfers.

156.    Pursuant to Bankruptcy Code section 502(d), any and all claims of Defendant against the Debtor's estate, including any and all claims assigned by Defendant, must be disallowed until such time as Defendant pays Plaintiff the amount equal to the Daily Transfers, in an amount of $1,164,459.90, together with applicable prejudgment interest, costs, and reasonable attorney's fees.

157.    Pursuant to Bankruptcy Code section 502(j), any and all previously allowed claims of Defendant against the Debtor's estate, that have been filed or will be filed, including any and all claims assigned by Defendant, must be reconsidered and disallowed until such time as Defendant pays to Plaintiff the amount equal to the Daily Transfers in the amount of $1,164,459.90, together with applicable prejudgment interest, costs, and reasonable attorney's fees.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter the Order and judgment against Defendant as identified herein, as follows:

i.    On his first claim for relief against Defendant, for the entry of a declaratory judgment reclassifying the MCA Agreements as loan transactions;

ii.    On his second claim for relief against Defendant, for entry of an order and judgment against Defendant declaring that the MCA Agreements are void, and thereby avoiding the Daily Transfers and interest in the amount of $1,164,459.90, together with applicable prejudgment interest t, costs, and reasonable attorney's fees;

iii.    On his third claim for relief against Defendant, for entry of an order and judgment against Defendant declaring that Defendant be forever barred from asserting any and all claims, liens, or interest in and to the Daily Transfers.

iv.    On his fourth claim for relief against Defendant, for entry of an order and judgment: (a) avoiding and setting aside the Daily Transfers; and (b) pursuant to Bankruptcy Code section 550(a), recovering from Defendant $1,164,459.90, together with applicable prejudgment interest, costs, and reasonable attorney's fees;

v. On his fifth claim for relief against Defendant, for entry of an order and judgment: (a) avoiding the Daily Transfers pursuant to NY UVTA section 273(b); and (b) pursuant to Bankruptcy Code section 550, recovering from Defendant $1,164,459.90, together with applicable prejudgment interest, costs, and reasonable attorney's fees;

vi. On his sixth claim for relief against Defendant, for entry of an order and judgment: (a) avoiding the Daily Transfers pursuant to NY UVTA section 274; and (b) pursuant to Bankruptcy Code section 550, recovering from Defendant $1,164,459.90, together with applicable prejudgment interest, costs, and reasonable attorney's fees;

vii. On his seventh claim for relief against Defendant, for entry of an order and judgment: Defendant in the amount of $1,164,459.90, together with applicable prejudgment interest, costs, and reasonable attorney's fees;

viii. On his eighth claim for relief against Defendant, for entry of an order and judgment: (i) avoiding the 90 Day Transfers made by the Debtor to the Defendant; and (ii) a money judgment in an amount to be determined at trial, but in no event believed to be less than $20,117, together with applicable prejudgment interest, costs, and reasonable attorney's fees;

ix. On his eighth claim for relief against Defendant, for entry of an order, pursuant to Bankruptcy Code section 502(j), disallowing any and all previously allowed claims of Defendant against the Debtor's estate, that have been filed or will be filed, including any and all claims assigned by Defendant, until such time as Defendant pays to Plaintiff the amount equal to the Daily Transfers in the amount of $1,164,459.90, together with applicable prejudgment interest, costs, and reasonable attorney's fees; and

x. granting such other and further relief in the favor as may be just and proper.

Dated: April 4, 2025
Wantagh, New York

**LaMONICA HERBST & MANISCALCO, LLP**
*Counsel to Salvatore LaMonica, Chapter 7 Trustee*

By: *s/ Joseph S. Maniscalco*
Joseph S. Maniscalco, Esq.
Jacqulyn S. Loftin, Esq.
Partners of the Firm
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: 516.826.6500